UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WALTER NORTON | Criminal No.: 1:24-cr-10090-WGY<br>**LEAVE TO FILE GRANTED** 2-13-25 |

## DEFENDANT WALTER NORTON'S RESPONSE TO GOVERNMENT'S OPPOSITION TO THE MOTION TO SUPPRESS

The Government has filed an Opposition to Defendant Walter Norton's (hereinafter, the "Defendant" or "Norton") Motion to Suppress evidence seized and intended to be used against the Defendant. The Court has indicated that it will hold an evidentiary hearing on Defendant's Motion. Prior to that hearing, Counsel is responding to the Government's Opposition to preserve the record.

In their Opposition, the Government has set forth their position as follows: (1) "Police had reasonable suspicion to stop Norton's vehicle on April 3, 2024, based on their observations of him at Jason Hunter's residence," and (2) "based on a traffic infraction committed prior to the stop" *Government's Opposition,* p. 1. As part of their reasonable suspicion position, the Government states in detail that they were conducting an investigation of co-defendant Hunter's involvement in money laundering violations. *Id.* 1-4. In that respect, for purposes of the instant Motion, Defendant concedes that the Government agents had reasonable suspicion to believe Hunter was involved in money laundering violations.

It is the Government's view they also had reasonable suspicion that Norton was involved in Hunter's illegal conduct because on April 3, 2024, Norton visited Hunter's alleged residence for approximately 20 minutes. *Id.* 4. Norton walked into Hunter's residence with a duffle bag and

1

exited 20 minutes later with the same duffle bag. *Id*. After exiting with the duffle bag and placing it in his vehicle, Norton then walked down Hunter's driveway a short distance, returned to his vehicle after 20 seconds, got inside the vehicle, and "appeared to place an item on the front passenger seat." *Id*. Norton drove away from Hunter's residence, followed by investigators, stopped at a pet store and purchased items, then was followed for approximately twenty (20) more minutes until he was ordered to pull over for an investigatory stop (as described *infra*). *Id*. 4-5.

In the Government's viewpoint, investigators had "reasonable suspicion" that Norton was involved in criminal activity and an order for him to stop on Route 95, many miles from the target residence of Hunter was "justified by investigators' observations of him at Hunter's residence and by Norton's behavior after exiting the residence." *Id*. 5. Norton's alleged behavior exiting the target residence was allegedly that he "appeared more anxious, he was looking around as if concerned about his surroundings and was moving quickly and with purpose." *Id*. 4. This is not only disputed, but Counsel cannot discern what it means or how someone can unilaterally come to those conclusions.

As stated, it is conceded for purposes of the instant Motion that Hunter was the target of an investigation into laundering money from illegal drug transactions. Notwithstanding, that does not explain how Norton, unknown to investigators at the time, arriving at Hunter's residence prior to another money-laundering transaction occurring, provided sufficient *reasonable suspicion,* in the Government's view, that Norton was somehow involved in Hunter's illegal activity. As the Government puts it:

> Norton's arrival on the morning of April 3 at 354 Revere Street
> and entrance into Apartment 2, where investigators knew
> Hunter to be, carrying a duffel bag, were noteworthy. Norton's departure
> twenty minutes later with the same duffel bag and his change in

2

> behavior—looking around and moving with purpose whereas he had previously appeared unconcerned—gave investigators reason to suspect that Norton was engaged in criminal activity. That Norton appeared to access Hunter's vehicle prior to his departure, and that he drove in a surveillance-conscious manner, bolstered the reasonableness of investigators' belief that his visit to Hunter's residence involved the retrieval of drugs or drug proceeds. ...

*Id.* 6-7. This speculation is, in the Government's opinion, indicative of criminal activity and warrants reasonable suspicion strong enough to violate the constitutional rights of a citizen to be free from unreasonable searches and seizures and to be stopped on an Interstate highway on whim and caprice in order to go on a fishing expedition. To sustain the Government's view of reasonable suspicion in this case would mean that if it were Mother Teresa who entered Hunter's residence, then she could have been ordered to pull over as Norton was.

As a preliminary matter pre-hearing, counsel will tersely point out the flaws in the Government's position.

a. To begin, it is disingenuous for the Government to interject into the issue *sub judice* anything to do with a stop related to traffic violations. Norton was not ordered to stop because of a civil infraction; this was an investigatory stop planned in advance and ordered by those conducting an investigation of Hunter. Government documentation clearly supports this fact and anything to do with a traffic violation stop ought to be taken off the table *post haste*. *See, e.g.* Norton was stopped by the order of one of the lead investigators (attached to Motion to Suppress as Exhibit A, ¶ 28); Statement of Massachusetts State Police Trooper Hysa that he "was advised to conduct a directed investigatory motor vehicle stop" of Norton (attached to Motion to Suppress as Exhibit B, ¶ 1).

b. The evidence presented by the Government through its statements of the investigation of Hunter clearly demonstrates that Hunter was not conducting money laundering activities or drug

transactions at the target location but would in fact travel to other locations to complete transactions. Thus, investigators had no evidence at the time of Norton's arrest that the target house was being used to deal drugs or launder money.

c.  Investigators did not know who Norton was when he arrived at the target house or who he was visiting at the residence. Apparently, the target house had at least two (2) residences. Investigators did not know how many people lived in the residences nor who in particular Norton visited in the house, since they never saw Norton and Hunter together.

d.  The subjective observations of investigators concerning Norton's appearance upon exiting the target house is not indicative of criminal activity. Even if believed, which is hard to do, a nervous appearance in general is not proof in any respect that a person is involved in criminal behavior.

e.  Documents provided by investigators of Norton's alleged twenty (20) second walk down Hunter's driveway clearly demonstrates that investigators never claimed, as the Government has, that Norton visited Hunter's vehicle or that he ever had anything in his hands upon entering his own vehicle after the short walk down the driveway.

f.  It is hard to believe that investigators were in any position to observe that Norton put something on the passenger seat of his vehicle, or what said item may have been. Investigators already stated that they did not know what Norton allegedly did when he walked down the driveway nor did they observe his hands.

g.  Investigators' statements that Norton, when driving, was attempting to detect surveillance by maneuvering his vehicle, is absurd, at best. Documents produced by investigators show that Norton was driving north on the heavily travelled Route One. Drivers on this road, like all other heavily travelled interstate roads, frequently weave in and out of lanes in order to avoid slower

4

drivers. It is done hundreds of times a day. Weaving in and out of traffic and switching lanes is not indicative that said driver is involved in criminal activity.

## Conclusion

The Court ought to preliminarily consider the above facts pre-hearing.

Respectfully submitted,<br>
The Defendant,<br>
Walter Norton,<br>
By his attorney,

DATED: February 13, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Email: Richard@chamberslawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

DATED: February 13, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.