UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WALTER NORTON | Criminal No.: 1:24-cr-10090-WGY |

**DEFENDANT WALTER NORTON'S MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF MOTION TO SUPPRESS**

NOW COMES, the Defendant Walter Norton, (hereinafter, the "Defendant" or "Norton") by and through undersigned counsel, and respectfully moves the Court to reconsider its March 10, 2025 ruling denying suppression of evidence seized by the Government upon Defendant's arrest on April 3, 2024. In support of this Motion, undersigned counsel submits the following:

**Salient Background**

While the Court did not specifically rule on whether or not there was "reasonable suspicion" to perform an investigative stop of the Defendant, *see infra*, it is clear from evidence produced at the Suppression Hearing on March 10, 2025 (hereinafter, the "Hearing") that there was not any reasonable suspicion that the Defendant was involved in criminal activity and, absent relying on other grounds to deny the motion, the Court would more than likely have so ruled.

The testimony of the two (2) Government witnesses was that the day of the Defendant's arrest was the first time they had ever seen him. *See, e.g*. Witness Special Agent Ryan P. Glynn, (hereinafter, "SA Glynn") Hearing Transcript (hereinafter, "T"), p. 17 (never had seen Norton prior to April 3, 2025). SA Glynn testified that he could not see Apartment 2, which was where they believed co-defendant Hunter resided. T. 39. He testified that it was Agent Higgins

1

(hereinafter, "Higgins"), who never testified, who saw Norton "enter … Apartment 2" and radioed that information to him, T. 24, and Higgins again who saw Norton exit "Apartment 2", T. 25. As Defendant's exhibits demonstrate, however, Higgins was not in a position to see the doorway to Apartment 2, but only the gateway that led to a side alley where the entrance to Apartment 2 was located. These are some of the exhibits the Court was perusing during the Hearing, showing the photo of Norton carrying a duffle bag on Thorndike Street, obviously taken from across Revere Street, where Higgins was parked on the other side of Revere Street. and at an angle facing Thorndike Street. Thus, it is obvious from the record that Higgins could only see the gate that led to the opposite side of the house from Thorndike Street, which gate the agents were signifying was "Apartment 2" (the money-laundering action taking place on Thorndike Street and thus the street the agents were monitoring). Other exhibits submitted by the Defendant show without question that the gateway to Apartment 2 also led to another door and consequently it was impossible from Higgins' position for him to observe where Norton went once Norton went through the gateway. SA Glynn also testified that no agents knew at the time Norton arrived on April 3, 2025 what was behind the door marked Apartment 2 nor where it led to. T. 32. Moreover, it is obvious that several different people lived in Apartment 2; the same people listed in another lease agreement from New Hampshire that is part of the exhibits. Consequently, there was not evidence produced that Norton had entered Apartment 2, and even if he did, who he may have visited there.[1] In fact, the agents had never seen Hunter and Norton together. T. 41.

---

[1] The Court noted that there's only a "reasonable inference" that Norton went into Apartment 2, not that Norton in fact went into that door. See T. 72.

Although the Court avoided making a specific ruling on the reasonable suspicion of criminal activity argument, Defendant submits that not only is there no support for such a finding in the Hearing record, whatever evidence that would tend to support such a finding is, in the Court's view, "pretty thin", T. 72, 73. In fact, the Court conceded that the agents were going to pull over the Defendant "no matter what" once he left the house although it was nothing more than on "a hunch". T. 74. In the final analysis, the Court denied the motion to suppress for the simple reason that the Defendant eventually had committed "clear motor vehicle violations" and that alone justified turning on the trooper's "blue lights" that effectively seized the Defendant with an order to pull over. T. 76.

1.  **Traffic violation**.

While Massachusetts State Police Trooper Xhuljo Hysa (hereinafter, "Trooper Hysa") testified that Norton made illegal lane changes, it should be noted the Government did not turn over the cruiser mounted camera (hereinafter, "CMC") video. The Government only turned over Trooper Hysa's body camera that begins with him getting out of his cruiser to arrest Norton. Upon further request, the Government claimed on two (2) separate occasions that the cruiser Trooper Hysa was operating on the day of Norton's arrest did not have a CMC.

Trooper Hysa testified that the traffic violation at issue as a reason to stop Norton was that Defendant "was always in the left lane and at a red light he moved from the left lane all the way into the right lane, unexpectedly, and in my eyes that's a marked-lane violation, an unsafe mark-lane violation." T. 53. Trooper Hysa said that a marked lane violation is "basically crossing from one lane to another unsafely. You've got to maintain that lane." *Id*. Trooper Hysa further testified "that's a marked-lane violation under Massachusetts state traffic laws." T. 54.

First, what Trooper Hysa claimed the Defendant did is not a traffic violation under Massachusetts law. Pursuant to M.G.L. c. 89 § 4A a marked lane violation occurs only when he changes lanes after *the driver* "first ascertain[s] if such movement can be made with safety." Obviously, Norton did ascertain such and Trooper Hysa never testified that the lane change caused any traffic problems but only that in his eyes it was dangerous. It was a subjective observation motivated by needing some stated excuse for carrying out the order to stop Norton at all costs. In *Commonwealth v. Larose*, 483 Mass. 323 (2019) the SJC consistently held that a marked lane violation under the statute occurs only if "a driver" fails to ascertain "the safety of a" lane change "before executing that movement." Id. 329, 330, 331, 332. Hysa never said what exactly the Defendant did that violated this statute used as a pretext to stop him.

Second, Trooper Hysa was driving a marked state police cruiser. Public information is that all marked state police cruisers are equipped with CMCs. According to *Massachusetts State Police General Order dated November 10, 2021, Adm-35*, CMCs are both turned on automatically and can also be turned on by hand. Troopers "shall activate the CMC in conjunction with official law enforcement duties while … on regular tours of duty."  Troopers are "required to record contact with civilians regardless of the number of CMC and/or BWC [body worn cameras] members present and recording …" during "traffic and criminal enforcement stops, in progress, violations of law, pursuits, investigative person stops" etcetera. No CMC "footage or recordings shall be deleted/destroyed while any related investigation is still open/pending", including until the time appeals are exhausted. Troopers "failing to record a required incident shall document the circumstances in the applicable report and articulate the reason(s) the incident was not recorded". (*Cf. Larose, supra* at 325 (noting that the traffic violation was captured on a CMC)).

The Government failed to supply in mandatory discovery the CMC of Trooper Hysa's vehicle, nor any documentation of why the CMC failed to record the incident, especially the alleged traffic violation that is now at the center of the instant motion.

The Court credited Trooper Hysa's testimony as to the traffic stop. However, at the time neither the parties nor Court were aware that the Massachusetts State Police failed to turn over the CMC that would have verified the traffic violation that Trooper Hysa was claiming occurred, justifying his stop of the Defendant. The Government only turned over Trooper Hysa's body worn camera, which begins only at the arrest. It is highly suspect, and affects Trooper Hysa's credibility, that there is a failure to turn over the CMC that would objectively demonstrate whether or not there was a traffic violation as claimed by Trooper Hysa.

The Court is referred to *United States v. $1,032,980.00*, 855 F.Supp.2d 678 (N.D. Ohio 2012) in its holding that, although *Whren v. United States*, 517 U.S. 806 (1996) held that subjective reasons for a traffic stop are irrelevant, "an officer's subjective motivations may nevertheless be relevant in assessing the credibility of the officer in the matter of whether an actual traffic violation was truly observed, or there was no genuine traffic violation, and the stop was pretextual." 855 F.Supp. at 692. In this case, of course, both witnesses at the hearing testified that from the time the Defendant was allegedly in co-defendant Hunter's residence they were going to conduct an investigatory stop of the Defendant. That was Trooper Hysa's subjective reason for the stop; they were going to stop the Defendant one way or the other.[2] They were stopping the Defendant "on a 'hunch'". *Id*. 693. The judge in the referenced case cited above noted that "despite the availability of video recording technology, the Troopers only

---

[2] Of course, the Court has already held, in effect or by inference, that Trooper Hysa had no constitutional "reasonable suspicion" that the Defendant was involved in criminal activity with Hunter.

5

initiated video recording of their pursuit of the Silverado after they decided to stop the vehicle, approximately at the moment they and the Silverado pulled off the side of the highway." *Id*. 695. The district judge found this fact disturbing and affecting the credibility of the testifying state trooper because the lack of the video "exacerbates the credibility questions". *Id.* 695-696.

      The Court should reconsider the credibility of Trooper Hysa because the Government failed to turn over the CMC footage that would have objectively depicted the alleged traffic violation committed by the Defendant that Trooper Hysa claims warranted the stop. If the Government claims there is no such recording, then the hearing ought to be reopened to find out why no such recording exists and whether there is a report by Trooper Hysa that shows why the incident wasn't recorded on the CMC of his cruiser. *See Department of State Police General Order Adm-35 11-10-21*, ("Members failing to record a required incident shall document the circumstances in the applicable report and articulate reason(s) the incident was not recorded"). If the Government insists on claiming that the cruiser did not have a CMC, then the Defendant ought to be given an opportunity to inspect the cruiser and to find out why it did not have one and why that particular cruiser was used when it was ill-equipped to comport with the state police rules on camera use in investigations. This should include the right to inspect the Massachusetts State Police records showing all marked cruisers that had CMCs installed from the beginning of the program. In other words, since whether the cruiser did or did not have a CMC is crucial to the decision of the Court, the Defendant ought to have access to inspect the cruiser itself and all records pertaining to the installation of CMCs on State police cruisers. In that respect, a relevant order ought to be issued by the Court.

      The lack of CMC footage is potential exculpatory evidence and is a serious consideration as to Trooper Hysa's credibility that he observed the Defendant commit a traffic offense that

gave him reason to stop the Defendant, leading to the instant case. At the very least, the Court should consider that exculpatory evidence may have been withheld by the Government.

**2.    Lack of reasonable suspicion made following Defendant a violation of due process and equal protection of the law.**

The Court has ruled that the alleged traffic violation witnessed by Trooper Hysa was sufficient reason to initiate the stop of the Defendant, leading to the instant charges. The Court found, in effect or by inference, that there was not sufficient reasonable suspicion of criminal activity by the Defendant at 354 Revere Street to support an investigatory stop.

Despite the lack of reasonable suspicion that the Defendant had participated in any criminal activity at 354 Revere Street agents followed him anyway with the stated objective of stopping him for investigation. In other words, before the Defendant even left 354 Revere Street, agents were going to subvert the reasonable suspicion of criminal activity rule required under the Fourth Amendment and stop the Defendant despite not having the evidence required by the law.

This action by the agents violated the Defendant's substantive and procedural due process rights, besides his equal protection rights. The Defendant should not have been followed by agents who testified they were going to stop the Defendant one way or the other. Had the Defendant not been followed, the instant charges stemming from the alleged traffic stop would not have occurred. Defendant's substantive due process rights are focused on his rights under the Fourth Amendment to be free from unreasonable searches and seizures, while his procedural due process rights are focused on the agents' subversion of jurisprudence that requires reasonable suspicion of criminal activity before initiating a vehicle stop. In the latter case, there is little doubt that the real reason behind the stop was subjective, since the agents had decided to stop the Defendant for suspicion of criminal activity while he was allegedly still in co-defendant Hunter's alleged apartment, albeit the Government claims observation of a traffic violation.

"The substantive due process guarantee functions to protect individuals from particularly offensive actions on the part of government officials, even when the government employs facially neutral procedures in carrying out those actions." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (citing the authority of *Daniels v. Williams,* 474 U.S. 327, 331 (1986). "'[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression."'" *Collins v. Harker Heights,* 503 U.S. 115,126 (1992) (citing *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989) (alterations in original). A procedural due process violation can be established when a person identifies "a protected liberty or property interest and" alleges that, in this case, law enforcement officers, "deprived [him] of that interest without constitutionally adequate process." *Gonzales-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011). "The equal protection guarantee of the Fourteenth Amendment prohibits the state from 'deny[ing] any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. With reference to a governmental action, this language has been interpreted to mean that "all persons similarly situated should be treated alike. ... Its protections extend to both legislative and executive conduct." *Pagan, supra*, 448 F.3d at 34 (cites omitted) (alterations in original).

There is little doubt that the events that occurred on April 3, 2024 at 354 Revere Street involving the Defendant's alleged twenty (20) minutes at that address did not amount to the reasonable suspicion that he was involved in criminal activity as required by Fourth Amendment jurisprudence to authorize an investigative stop. Agents knew, or should have known, this. What the agents did was subvert the Defendant's Fourth Amendment rights, which required reasonable suspicion, and instead violated those rights by following him until he would eventually violate

8

even the most insignificant traffic law, which Defendant claims and the statute itself demonstrates he did not violate.

That scenario is a violation of the Defendant's rights to due process. He had not done anything to warrant suspicion of criminal activity under the mandates of jurisprudence. He had not done anything at Revere Street that would have given agents a reason to stop him. He had not done anything to warrant being followed with the object of stopping him at some point. He had not done anything that warranted being seized and searched. He had a due process right to have his rights under the Fourth Amendment to be honored and not be stopped for investigation into criminal activity, the obvious reason he was stopped, which is what the two (2) witnesses confirmed in their testimony. Moreover, it is obvious that all citizens travelling on the highways in Massachusetts who commit traffic violations are recorded on CMCs since all cruisers have such installed. These cameras provide objective proof of the violation. In this case, for some unstated reason, Defendant's alleged traffic violation was not recorded by a CMC. Defendant had a right to be treated equally as other drivers in the Commonwealth by having his alleged traffic violation recorded.

Most respectfully, counsel directs the Court's attention to Justice Budd's concurrence (joined by Justice Lenk) in *Commonwealth v. Long*, 485 Mass. 711 (2020) and not only requests that the Court consider the erudite discussion of the unconstitutionality of pretextual stops, but also to adopt Justice Budd's suggestion to do away with such subversion of motorist's Fourth Amendment rights. While the *Long* case involved unconstitutional racial bias in a pretextual stop, the same principles pertain to the instant case.

The majority noted, of course, that "the plethora of potential traffic violations is such that most drivers are unable to avoid committing minor traffic violations on a routine basis, thereby

9

affording officers wide discretion in the enforcement of traffic laws." *Id*. 718. *See also, id*. 739 ("'[v]ery few drivers can traverse any appreciable distance without violating some traffic violation'") (citations omitted) (alteration in original).The two concurring justices found, however, that pretextual stops used "as a means to act on hunches" and are not supported "by reasonable suspicion" are unconstitutional "because they allow for the investigatory stop of an individual without reasonable suspicion of the crime sought to be investigated" and that all such stops ought to be prohibited. *Id*. 737. "[L]aw enforcement officers have powerful incentives to use traffic violations as a pretext to conduct investigatory stops." *Id*. 739. "[P]olice all over this country [are being trained] to use traffic violations, which everyone commits the minute you get into your car, as an excuse to stop and search" in the cited case, people with "dark skin" but also applicable in general. *Id*. 740. The concurrence noted that the reasonable suspicion exception for probable cause mandated under the Fourth Amendment is subverted by a pretextual stop because it "strips away" the constitutional protection. "[I]f an officer wants to investigate a hunch about suspected criminal activity in connection with a particular motor vehicle" all the officer has to do is "simply wait until the driver commits a traffic violation, stop the vehicle based on that violation, and then attempt to get more information during the stop to corroborate the hunch." *Id*. 741-742. This subterfuge "automatically categorizes any stop preceded by a traffic violation as 'authorized' and therefore presumptively reasonable, regardless of the actual motivation for the stop." *Id*. 742. Jurisprudence doesn't allow such stops of pedestrians and shouldn't be used for vehicles. *Id*. 743. "The reasonable suspicion requirement is the linchpin of a valid investigatory stop [under the reciprocal Commonwealth constitutional amendment]. Using pretext to circumvent it breaks with our fundamental rules of search and seizure." *Id*. 744. The concurrence

pointed out other state decisions that have condemned pretext, despite contrary jurisprudence, and held that pretext "is result without reason." *Id*.

The concurrence noted that they were not aware of any cases that were directly on point, *id*. 749, but that "as long as we continue to allow pretextual stops, the search and seizure protections of art. 14 will continue to ring hollow." *Id. 756*.

Counsel suggests it is time to take a definitive stand on pretextual stops and follow the concurrence in *Long* and the other state decisions noted therein. The Defendant had a due process and equal protection right to have his Fourth Amendment rights honored and not have them subverted for pretextual reasons.

## **Conclusion**

Because of all the foregoing, the Court ought to reconsider the denial of the suppression motion and grant said motion. Alternatively, the Court ought to reopen the hearing to allow for further testimony regarding an alleged lack of a CMC on Trooper Hysa's cruiser and the Court ought to issue an order to allow Defendant, through a private investigator, to examine the cruiser Trooper Hysa used on April 3, 2024 when he arrested the Defendant and to also peruse all State Police records concerning the installation on each Massachusetts State Police cruiser of a CMC.

Respectfully submitted,
The Defendant,
Walter Norton,
By his attorney,

DATED: April 1, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Email: Richard@chamberslawoffice.com

## **CERTIFICATE OF SERVICE**

    I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

DATED: April 1, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.